[No. B171255. Second Dist., Div. Five. July 18, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCEL ROQUEMORE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 976(b) and 976.1, this opinion is certified for publication of parts I., II., III.A.1.–3., and IV.

## COUNSEL

Judith Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Margaret E. Maxwell, Lawrence M. Daniels, Yun Lee and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TURNER, P. J.—**

## I. INTRODUCTION

Defendant, Marcel Roquemore, appeals from his convictions for two counts of attempted murder. (Pen. Code,[1] §§ 187, subd. (a), 664.) The jury also found: the attempted murders were willful, deliberate and premeditated (§ 664, subd. (a)); defendant, a principal, personally used and discharged a firearm causing great bodily injury (§ 12022.53, subds. (b), (c), (d), (e)(1)); and the conduct promoted street gang activities. (§ 186.22, subd. (b)(1).) In the published portion of this opinion, we discuss whether defendant unequivocally asserted his right to counsel when interrogated on September 27,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2002. We conclude the question defendant asked concerning an attorney on September 27, 2002, was equivocal. Hence, defendant's statements made on September 30, 2002, were properly admitted as evidence against him. (*Davis v. United States* (1994) 512 U.S. 452, 458–459 [129 L.Ed.2d 362, 114 S.Ct. 2350]; *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1122–1127 [23 Cal.Rptr.3d 295, 104 P.3d 98].)

## II. FACTUAL BACKGROUND

We view the evidence in a light most favorable to the judgment. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Osband* (1996) 13 Cal.4th 622, 690 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *Taylor v. Stainer* (9th Cir. 1994) 31 F.3d 907, 908–909.) On September 27, 2002, Rodrigo Pineda and Martin Espinoza were sitting on the steps of an apartment building in Long Beach. Two Black men dressed in black sweatshirts approached them and asked, "Where are you from?" Mr. Espinoza said they were from "nowhere." Thereafter, the two Black men drew guns and began shooting. Mr. Espinoza fell forward after he was shot in the arm. Mr. Pineda turned to run away. Mr. Pineda heard about 10 shots as he ran. Mr. Pineda was shot in the back of both legs and his left foot. Mr. Pineda fell and blacked out after he was shot.

Long Beach Police Officer Matthew Esproles arrived at the shooting scene. Officer Esproles saw the two bleeding victims, who described the two assailants and said they had fled. Officer Esproles broadcast a description of the assailants as two Black males crossing Seventh Street, possibly into the park or school. Officer Esproles described the assailants as two African-American men, one tall and thin and the other shorter. Both wore black clothing. Ten shell casings and three projectile fragments were found at the scene. Seven of the casings were .380-caliber and three were .40-caliber.

Police Officer Michael Bolling heard the radio dispatch regarding the shooting. Officer Bolling heard that the two assailants ran in the direction of Caesar Chavez Park. Based upon the facts and descriptions given, Officer Bolling went to an area of the park where local African-American gang members often congregated. Officer Bolling was familiar with the fact there had been numerous gang-related shootings between Hispanic and Black gangs in the area. Officer Bolling saw five to eight young Black men standing in front of a residence. Officer Bolling spoke with the men about what had occurred. Officer Bolling patted each man down. As he was speaking to the men, Officer Bolling saw a Black man dressed in dark clothing and a hooded

sweatshirt. The man, who ultimately turned out to be defendant, was running in Officer Bolling's direction. Officer Bolling then made eye contact with defendant. Thereupon defendant turned around and ran back into an alley in the opposite direction. Officer Bolling alerted other officers by radio that defendant was fleeing.

Officer Sovanna Ly drove into the alley where the defendant had fled. Officer Ly saw defendant running in the alley. Officer Ly ordered defendant to stop. Defendant was then detained. Officer Ly noticed that defendant wore black pants and was holding a black sweatshirt. Defendant was sweating profusely and had a rapid heartbeat. Officer Bolling came to the patrol car where defendant was detained. Officer Bolling recognized defendant as the same individual who had fled into the alley. Officer Ly drove defendant to a nearby hospital, where individual field showups were conducted with the two victims. After being admonished, both Mr. Pineda and Mr. Espinoza identified defendant as one of the individuals who shot at them. Mr. Pineda later identified defendant in a live lineup and at trial as one of the two men who fired their handguns. Mr. Espinoza was unable to identify anyone at the live lineup or at trial. Detective Hector Guiterrez, who interviewed Mr. Pineda at the hospital immediately after the shootings, was present when the field showup of defendant was conducted. Detective Guiterrez testified as to defendant's appearance. Defendant had altered his appearance since he was arrested. At trial, defendant was more clean-cut and well groomed. Defendant was wearing his hair in a shorter, thicker "Afro."

Defendant was arrested after being identified by the victims at the hospital. Defendant was advised of his constitutional rights while being driven to the police station. Defendant acknowledged that he understood those rights. Thereafter, defendant said he had recently been "jumped" by some male Hispanics. Defendant was again advised of his constitutional rights. Officer Ly then re-interviewed defendant. At one point, defendant was asked if he "tossed" the gun in the park. Defendant responded, "No." Defendant was asked who was the second "suspect?" Defendant said he did not know. Finally, defendant said he was confused.

Detectives Richard Birdsall and Scott Lasch interviewed defendant on September 30, 2002, regarding other shootings involving the local Black gang. This was three days after defendant's arrest. Defendant spoke willingly with them. Detective Birdsall asked defendant for the names of gang members involved in shootings at 20th and Pine Streets. Defendant gave Detective Birdsall five or six names, including Edward Crawford.

Detective Guiterrez had spoken to defendant on September 6, 2002. At that time, defendant identified himself as a member of the local Black gang. As noted, defendant was later interviewed by Detective Birdsall on September 30, 2002. On September 30, 2002, defendant indicated that he had been a member of the local Black gang, but no longer associated with gang members. Detective Mark McGuire had been assigned to the gang enforcement section of the Long Beach Police Department for six years. Detective McGuire was very familiar with the local Black gang. The local Black gang had approximately 800 to 1,000 documented members. Members often had tattoos depicting the gang letters and the clique or set to which they belonged. At the time of defendant's arrest in this case, he had three tattoos typically found on members of the Black gang. Detective McGuire testified that the primary criminal activities of the local Black gang involved vandalism, robbery, burglary, assault with a deadly weapon, attempted murder, murder, auto theft, forgery, fraud, kidnapping, residential robbery, and carjacking. On March 29, 2001, Dominique Beatty Oden, a member of the local Black gang, was convicted of first degree murder and attempted murder. On August 13, 2002, another member of the local Black gang, Santawn Atuanya Miller, was convicted of four counts of attempted murder and one count of murder. On December 24, 2002, Wallace Wendell Vaughn III, a member of the local Black gang, was convicted of first degree murder and eight counts of attempted murder.

According to Detective McGuire, the primary enemies of the local Black gang were members of a Long Beach based Hispanic gang. Conflict between the gangs was prevalent from 1995 to the time of trial in this case. During that time there were numerous murders and attempted murders between the gangs. When a gang member inquires, "Where are you from," it involves a challenge from one gang to another and typically occurs just prior to some type of violent action. The local Black gang was also known to target male Hispanics who were not necessarily gang members. The local Hispanic gang members often wear "Raider" colors or black jerseys with silver numbers. By targeting Latinos, the Black gang members gain an intimidation factor over Hispanic gang members and innocent citizens. According to Detective McGuire, this allows the Black gang to dominate the territory and continue criminal activities within the neighborhood. It also allows the Black gang to dictate the sale of drugs in the neighborhood.

A Black gang member who committed an attempted murder would bolster his reputation and status with the gang. Detective McGuire addressed the situation where a member of a Black gang had been beaten by male Hispanics. In that case, there would be an expectation that the Black gang would retaliate against the individuals who participated in the beating or

simply attack any Hispanic person. Detective McGuire explained: the local Black gang in Long Beach often held meetings to discuss the crimes they were committing and assigned members to commit them; the local Black gang often assigned members who were similar in height, weight, and stature to commit crimes while dressed similarly in dark clothing; by doing so, they avoided capture and made it more difficult for witnesses to identify them; the gang members often wore baseball caps, knit caps, hooded sweatshirts, and scarves to conceal the top of their heads and faces; and the gang members also frequently disposed of the guns used in the crime in the event the police followed them. Detective McGuire believed defendant was a member of the local Black gang. This was based upon: defendant's tattoos; his self-admitted membership; and his association with other gang members.

## III. DISCUSSION

### A. Defendant's September 30, 2002 Statements to Detective Birdsall

#### 1. Defendant's statements to police

Defendant argues with considerable precision as follows. On September 27, 2002, he concluded a period of interrogation by unequivocally asserting the right to the assistance of counsel. Several days later, on September 30, 2002, while still in police custody, defendant was approached by two detectives who did not readvise him of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]). Defendant argues that because he unequivocally asserted his right to counsel on September 27, 2002, no interview could occur on September 30, 2002, without compliance with the prerequisites set forth in *Edwards v. Arizona* (1981) 451 U.S. 477, 484–485 [68 L.Ed.2d 378, 101 S.Ct. 1880]. (See *People v. Stitely* (2005) 35 Cal.4th 514, 535 [26 Cal.Rptr.3d 1, 108 P.3d 182]; *People v. Gonzalez, supra,* 34 Cal.4th at p. 1122.)

##### a. factual and procedural background

Prior to trial, the trial court conducted a hearing pursuant to Evidence Code section 402 on defendant's objection to the admission of his September 30, 2002, statements to the police. In reference to the September 30, 2002, interview by Detective Birdsall, defendant's trial attorney argued: "[T]he questioning was in violation of his *Miranda* rights and his right-to-counsel rights. So for these purposes, it's in violation of the Fifth and Sixth Amendment of the Constitution, and it should not be admitted. [¶] . . . Once

he invoked his right to call a lawyer, I believe that anything after, he had to be readvised when asked questions that would lead to incriminating information on this case."

According to Officer Ly, defendant was driven to a hospital and then to the police station in Long Beach. While being driven, defendant was advised of his *Miranda* rights. Officer Ly read the *Miranda* warnings to defendant from a standard admonishment card. Defendant was asked if he understood his rights. Defendant said, "Yes, sir." Defendant then asked if he could say something. Officer Ly responded: "Go ahead. You know your rights." Defendant then said that he had been "beaten up" by some "male Hispanic" gang members. Defendant was asked if he was upset and the shooting was in revenge. Defendant did not respond to the question about revenge. Once at the police station, defendant asked to speak to Officer Ly alone. Officer Ly told defendant that once they completed the booking paperwork, the could go upstairs to an interview room and talk. Thereafter, Officer Ly took defendant to an interview room. Defendant was asked if he remembered his *Miranda* rights. Defendant said that he did. Defendant was asked if he had "tossed" the gun in the park. Defendant responded, "No." When asked who had been with him, defendant "mumbled" that he did not know. Defendant also asked how much time he "was looking at doing." After asking how much time he was "looking at," defendant said he was confused. Officer Ly described what defendant said next, "Can I call lawyer to talk to me or his mom." At another point Officer Ly described the conversation, "He said he was confused, and he asked if he could call his lawyer or his mom to talk to me." When questioned by the trial court, Officer Ly testified defendant's exact statement, made all in one sentence, was, " 'Can I call a lawyer or my mom to talk to you?' " The court adduced the following testimony: "THE COURT: Did he at any time state simply, can I call lawyer, period? Not the word 'period,' of course, But did he make that short statement? [¶] THE WITNESS: No, he didn't make that short statement."

As to whether defendant had invoked the right to counsel or silence, Officer Ly testified, "I don't believe he invoked his rights at all. I just—I didn't think we were getting anywhere because he was confused at the time, so maybe he needed to some time to think about it." Defendant was not immediately provided with the opportunity to make a telephone call. When asked if defendant was immediately provided with the opportunity to make a telephone call, Officer Ly testified: "Not then. At that time, he didn't make it clear he wanted to talk to his lawyer then and there."

On September 30, 2002, Detective Birdsall, accompanied by another investigator, met with defendant, who was still in custody. The purpose of the interview was to develop information concerning other crimes—not to elicit

statements concerning the September 27, 2002, shooting at the corner of Seventh and Main Streets. According to Detective Birdsall, the purpose of the interview was to develop information concerning an entirely different shooting incident at the corner of 20th and Pine Streets. The shooting at the corner of 20th and Pine Streets, which Detective Birdsall wanted to discuss, occurred some distance from the charged incident at the intersection of Main and Seventh Streets for which defendant was charged. Detective Birdsall was not investigating the September 27, 2002 shooting at the corner of Seventh and Main Streets. Detective Birdsall testified defendant was being approached as a witness, not as a suspect in the 20th and Pine Streets incident. Detective Birdsall routinely spoke to persons in custody who were potential witnesses. The detectives knew that defendant was a member of the local Black gang. Defendant was not advised of his constitutional rights at the beginning of the interview. Detective Birdsall explained: "He already had been advised of his *Miranda* rights. He said he wanted to talk to his mom or call an attorney, and we felt that we were obviously not going to be involved with any kind of statements he was going to give us [about the charged offense]." Detective Birdsall gleaned this by reading Officer Ly's written report.

Defendant was advised that the detectives were not going to ask any questions about the September 27, 2002, shooting at the corner of Seventh and Main Streets. At the beginning of the interview, defendant was not asked about the present charges. Detective Birdsall testified, "We identified ourselves as investigators, that we had no involvement in his case, nor did we want any information about his case."

Defendant willingly spoke to the detectives. At the outset of the interview which was then limited to the shooting in the "20th and Pine area," Detective Birdsall described the questions asked of defendant, "If he knew of any of his affiliates, friends, . . . gang members, who might be involved in the shootings in [the 20th and Pine area] specifically involving .40 caliber, .380, 9 millimeter handguns." Defendant was also asked about his gang membership and other gang members. Detective Birdsall described the questions as open-ended and involving crimes against Hispanics in the Long Beach area. The fact such discussion could be used as evidence to support a section 186.22 gang enhancement allegation did not occur to Detective Birdsall. Defendant denied *currently* being a gang member. Detective Birdsall testified, "He said he belonged to the . . . gang and that he, for the past year, had discontinued his affiliation with them."

About five minutes into the interview, Detective Birdsall testified the following question was asked, " 'We asked him if he knew the individuals in the gang who were shooting Mexican gang members in the area of both his arrest and 20th Street and Pine Avenue.' " Defendant then began to discuss

Mr. Crawford. According to defendant, Mr. Crawford supplied guns to gang members in order to shoot Hispanics. Without any followup questions about Mr. Crawford, Detective Birdsall described defendant's statements as follows: "He said . . . he had obtained a handgun, a .380 handgun, from Mr. Crawford. He was enlisting Mr. Crawford for some assistance because he had been beaten a week before by some [rival gang] members and that Mr. Crawford had gave [sic] him a gun, and he, Mr. Crawford, had a .40 caliber. They went over to the area of Seventh and Main in retaliation for his getting beaten up." Defendant stated that as he fled the scene of the Seventh and Main Streets shooting, he tossed the gun he had used into the backyard of an alley. Prior to readvising defendant of his constitutional rights, the two detectives did not ask him any followup questions; they simply sat and listened.

Thereafter, defendant was readvised on his constitutional rights. Defendant then stated he did not want to talk to the detectives. After invoking his right to silence, the detectives continued to talk to defendant. No questions were asked about the shooting at the corner of Seventh and Main Streets or Mr. Crawford. Defendant continued to give the detectives information about gang activities in the Long Beach area. Defendant's statements throughout the interview process, which lasted 30 minutes, were voluntary in the view of Detective Birdsall.

Defendant testified at the hearing on the motion to suppress his September 30, 2002, statements. Defendant admitted initiating the conversation with Officer Ly on September 27, 2002. Defendant wanted to talk to Officer Ly. Defendant was advised that it would be good for his case if he spoke to the two detectives. Defendant described Detective Birdsall's initial inquiry thusly, "He asked me about gangs . . . what I happen to know about anybody's involvement in shootings around the area of Pine and 20th and any involvement of—if I knew about any guns that had been used in the shootings." Detective Birdsall asked specific questions about Mr. Crawford. The two detectives asked defendant questions about the .40-caliber gun used in his case. Defendant said he did not know Mr. Crawford. Defendant did not recall that Detective Birdsall mentioning anything about waiving any rights. Defendant admitted that he had been advised of his *Miranda* rights on numerous occasions in the past. Defendant admitted that he was familiar with the right to remain silent and to have a lawyer present. Defendant also acknowledged that he was familiar with the criminal justice system because his stepfather was a Long Beach police officer. Defendant did not volunteer the information about what happened on the day of the shootings. Defendant denied volunteering any information about Mr. Crawford.

In denying the suppression motion, the trial court reasoned: "[I]t is somewhat unusual in that the—as I understand the defendant's testimony, he denied making the statement in the first place. So by his motion, he's asking the court to suppress statements that he did not make because any statements that he didn't make were taken in violation of Miranda. . . . [¶] The most telling thing that I drew from the defendant's testimony was that he repeated a couple of times that the officers were asking about the crimes in the vicinity of 20th and Pine, and in his testimony, he didn't mention the area where the crime that he's being charged with occurred. He repeated twice the officers talking about 20th and Pine, and that certainly matches the testimony of the detective who said that he contacted him to ask him about 20th and Pine. [¶] So in that regard, it's fully consistent with approaching him to see if he was willing to become a witness on the crimes that occurred in the area of 20th and Pine. [¶] . . . [¶] But even aside from that, the statement made by the defendant, according to the officer, about calling the attorney was can I call an attorney or my mom to talk to you, the police officer. I just don't think that that rises to the level of invoking his right to an attorney at the time of the questioning. [¶] If [defendant] had said can I call a lawyer, I would imply beyond that sentence that what he means is can I call a lawyer to represent me now and to be with me during questioning. But he added onto that sentence can I call a lawyer to talk to you, and I don't think that rises to the level of requesting an attorney to assist him in questioning. [¶] . . . [¶] But I can't get around the fact that the officer testified that his statement was I'm confused. Can I call a lawyer to talk to you? And that's just not the same as saying I want a lawyer representing me. I want a lawyer or my mom to talk to you, the police officer. [¶] . . . [¶] But I just don't see anything coercive about the interview by either Officer Ly or the other officer; and secondarily, I think that in both cases, there was compliance with Miranda."

### b. the suppression motion was properly denied

■ The California Supreme Court has held: "Under the familiar requirements of *Miranda*, . . . a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent." (*People v. Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992], citing *Miranda v. Arizona* (1966) 384 U.S. 436, 444–445, 473–474 [16 L.Ed.2d 694, 86 S.Ct. 1602].) The California Supreme Court has held, "Statements elicited in violation of this rule are generally inadmissible in a criminal trial." (*People v. Mayfield* (1997) 14 Cal.4th 668, 732 [60 Cal.Rptr.2d 1, 928 P.2d 485], citing *Miranda v. Arizona, supra*, 384 U.S. at pp. 492, 494; see also *People v. Neal* (2003) 31 Cal.4th 63, 67 [1 Cal.Rptr.3d 650, 72 P.3d 280].) ■ Federal decisional authority establishes that a waiver of a defendant's *Miranda* rights may be either express or implied. (*Fare v. Michael C.* (1979) 442 U.S. 707,

724–725 [61 L.Ed.2d 197, 99 S.Ct. 2560] [an *inquiry into the totality of* the circumstances should be made to determine whether the accused knowingly and voluntarily decided to forgo the right to remain silent]; *North Carolina v. Butler* (1979) 441 U.S. 369, 373 [60 L.Ed.2d 286, 99 S.Ct. 1755] ["waiver can be clearly inferred from the actions and words of the person interrogated"].) The California Supreme Court decisions are in accord. (*People v. Whitson* (1998) 17 Cal.4th 229, 247–250 [70 Cal.Rptr.2d 321, 949 P.2d 18] [although officers did not obtain an express waiver of defendant's *Miranda* rights, his indication that he understood his rights and his subsequent response to questions indicated a knowing and intelligent agreement to speak with the authorities]; *People v. Medina* (1995) 11 Cal.4th 694, 752 [47 Cal.Rptr.2d 165, 906 P.2d 2] [same]; *People v. Sully* (1991) 53 Cal.3d 1195, 1233 [283 Cal.Rptr. 144, 812 P.2d 163] [defendant impliedly waived his *Miranda* rights when, after being admonished of his rights, he responded affirmatively that he understood them and then gave a tape-recorded statement]; *People v. Davis* (1981) 29 Cal.3d 814, 823–826 [176 Cal.Rptr. 521, 633 P.2d 186] [same].) ▓ The United States Supreme Court further held that where a suspect asserts the right to counsel, questioning may not resume until an attorney is present, unless the arrestee voluntarily initiates contact with the authorities. (*Edwards v. Arizona, supra,* 451 U.S. at pp. 484–485; *People v. Neal, supra,* 31 Cal.4th at p. 67; *People v. Storm* (2002) 28 Cal.4th 1007, 1021 [124 Cal.Rptr.2d 110, 52 P.3d 52]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1033–1034 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Defendant asserts on appeal that because he unequivocally asserted his right to counsel on September 27, 2002, his September 30, 2002, statements were inadmissible under *Edwards*.

▓ In reviewing *Miranda* issues, we must accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported. However, in addition, we must independently determine from undisputed facts and those found by the trial judge whether the challenged statement was legally obtained. (*People v. Storm, supra,* 28 Cal.4th at pp. 1022–1023; *People v. Cunningham* (2001) 25 Cal.4th 926, 992 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Whitson, supra,* 17 Cal.4th at p. 248; *People v. Mayfield, supra,* 14 Cal.4th at p. 733.) As to factual matters, the Supreme Court has described appellate court review of disputes concerning historical facts, as distinguished from legal conclusions, as deferential in nature. (*People v. Holloway* (2004) 33 Cal.4th 96, 120 [14 Cal.Rptr.3d 212, 91 P.3d 164]; *People v. Ochoa* (1998) 19 Cal.4th 353, 401–402 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

2. Defendant's reference to counsel was equivocal

In this case, defendant specifically acknowledged that on September 27, 2002, his rights were read to him while in transit to the police station.

Thereafter, defendant asked to speak to Officer Ly. Defendant acknowledged that he remembered his "*Miranda* rights." Officer Ly then asked defendant about the shootings. Defendant evaded answering Officer Ly's questions. Defendant did inquire about how many people were involved in the shootings as well as how much time he was "looking at doing." Thereafter, defendant said he was confused. Defendant then asked "Can I call a lawyer or my mom to talk to you?" Officer Ly terminated the interview because he did not believe he was "getting anywhere." Officer Ly believed that defendant was confused and may need time to think. Officer Ly did not believe that defendant had asserted his right to counsel. (We will discuss shortly the effect of Officer Ly's subjective belief that no assertion of the right to counsel occurred on September 27, 2002.) The trial court found defendant did not invoke his right to have an attorney present during questioning.

■ In *Davis v. United States, supra,* 512 U.S. at pages 458–459, the United States Supreme Court held: "The applicability of the ' "rigid" prophylactic rule' of *Edwards* [*v. Arizona, supra,* 451 U.S. at p. 483] requires courts to 'determine whether the accused *actually invoked* his right to counsel.' *Smith v. Illinois* [(1984)] 469 U.S. [91,] 95 [83 L.Ed.2d 488, 105 S.Ct. 490] (italics added), quoting *Fare v. Michael C.*[, *supra,*] 442 U.S. [at p. 719]. To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. See *Connecticut v. Barrett* [(1987)] 479 U.S. [523,] 529 [93 L.Ed.2d 920, 107 S.Ct. 828]. Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' *McNeil v. Wisconsin* [(1991)] 501 U.S. [171,] 178 [115 L.Ed.2d 158, 111 S.Ct. 2204]. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." In *People v. Neal, supra,* 31 Cal.4th at page 84, the California Supreme Court in evaluating the voluntariness of a defendant's confession held: "[O]ur evaluation 'permits—indeed, it mandates—inquiry into all the circumstances,' including 'evaluation of [defendant's] age, experience, education, background, and intelligence . . . .' (*Fare v. Michael C.*[, *supra,*] 442 U.S. [at p.] 725 [61 L.Ed.2d 99 S.Ct. 2560].)"

In a variety of circumstances, appellate courts have found references to an accused's expressed desire for counsel to be ambiguous. (*People v. Gonzalez, supra,* 34 Cal.4th at pp. 1119, 1122–1127 [" '[I]f for anything you guys are going to charge me I want to talk to a public defender too, for any little thing' " found to be equivocal and ambiguous]; *Clark v. Murphy* (9th Cir. 2003) 331 F.3d 1062, 1070–1072 [defendant's statement, " 'I think I would like to talk to a lawyer' " was not an unequivocal request for counsel]; *Soffar v. Cockrell* (5th Cir. 2002) 300 F.3d 588, 593–596 [defendant's

questions on "whether he should get an attorney; how he could get one; and how long it would take to have an attorney appointed" were equivocal]; *Dormire v. Wilkinson* (8th Cir. 2001) 249 F.3d 801, 803–804 [the defendant's request to call his girlfriend was immediately followed by " 'Could I call my lawyer?' " found equivocal]; *Valdez v. Ward* (10th Cir. 2000) 219 F.3d 1222, 1231–1233 [after confessing to murder, the defendant's statement, " 'Yes, I understand it a little bit and I sign it because I understand it something about a lawyer and he want to ask me questions and that's what I'm looking for a lawyer' " found ambiguous]; *Burket v. Angelone* (4th Cir. 2000) 208 F.3d 172, 196–198 [" 'I think I need a lawyer' " was equivocal]; *Diaz v. Senkowski* (2nd Cir. 1996) 76 F.3d 61, 63–65 [" 'Do you think I need a lawyer?' " held to be equivocal]; *Coleman v. Singletary* (11th Cir. 1994) 30 F.3d 1420, 1423, 1426 [when asked about the appointment of a public defender, the defendant stated: " 'I don't know. But if he said to stop it I don't want to do what he said not to do' "]; *Lord v. Duckworth* (7th Cir. 1994) 29 F.3d 1216, 1219–1221 [" 'I can't afford a lawyer but is there anyway I can get one?' "]; *Connecticut v. Anonymous* (1997) 240 Conn. 708 [694 A.2d 766, 770–775] [" 'Do I still have a right to an attorney?' "]; *Gresham v. U.S.* (D.C. App. 1995) 654 A.2d 871, 873–875 ["at the time of his arrest but before the police questioned him, he invoked his right to counsel by asking his girlfriend, in the presence of police, to call his mother and tell her to get him a lawyer"—not a clear assertion of the right to counsel]; *State v. Eastlack* (1994) 180 Ariz. 243 [883 P.2d 999, 1005–1007] (conc. opn. of Kleinschmidt, J.) [" 'I think I better talk to an attorney' " found equivocal]; *Poyner v. Murray* (4th Cir. 1992) 964 F.2d 1404, 1410 ([" 'Didn't you tell me I had the right to an attorney?' " did not constitute an unequivocal invocation of the right to counsel under *Miranda*]; *Ex Parte Cothren* (Ala. 1997) 705 So.2d 861, 862–866 [" 'I think I want to talk to an attorney before I answer that' " subject to differing interpretations].)

 Here, although defendant was only 18, he admitted he was familiar with his *Miranda* rights based upon his numerous arrests. Also, defendant's stepfather was a police officer. Defendant initiated the discussions with Officer Ly. Defendant was advised of his *Miranda* rights while being driven to the police station. Defendant again asked to speak to Officer Ly at the police station. Defendant was reminded of his *Miranda* rights. Defendant's subsequent statement that he was confused and "[C]an I call a lawyer or my mom to talk to you?" did not constitute an unequivocal request for counsel to be present.

### 3. Other issues

 Two additional issues require analysis. First, there is no merit to the argument of the Attorney General that Detective Birdsall did not interrogate defendant on September 30, 2002 within the meaning of *Miranda*. The

United States Supreme Court has defined "interrogation" for *Miranda* purposes thusly: "We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300–301 [64 L.Ed.2d 297, 100 S.Ct. 1682], fn. omitted; see *People v. Roldan* (2005) 35 Cal.4th 646, 735 [27 Cal.Rptr.3d 360, 110 P.3d 289].) The purpose of the interview was to develop evidence of shootings of Hispanics by Black gang members. Defendant was also asked about his gang affiliation and other gang members. Open-ended questions were asked about crimes against Hispanics in the Long Beach area. The question asked by Detective Birdsall, which in turn led to defendant's discussion of Mr. Crawford and the September 27, 2002 shooting, was, as previously noted, "We asked him if he knew the individuals in the gang who were shooting Mexican gang members in the area of both his arrest and 20th Street and Pine Avenue." We agree with defendant that these express questions and the nature of the questioning were reasonably likely to elicit incriminating statements. As a street gang member, defendant is subject to enhanced sentencing pursuant to section 186.22; defendant was being asked about his street gang affiliation. Further, street gang activities may be prosecutable under conspiracy statutes. The explicit reference by Detective Birdsall to crimes involving the same racially motivated animus as the ones that led to defendant's arrest is also a relevant factor. Further, the question which led to defendant's discussion of Mr. Crawford and the September 27, 2002 shootings made reference to the corner of Seventh and Main Streets in Long Beach. These factors, taken collectively, fall within the scope of questions or conduct reasonably likely to elicit an incriminating response. (*People v. Sims, supra,* 5 Cal.4th at p. 444; *In re Albert R.* (1980) 112 Cal.App.3d 783, 792 [169 Cal.Rptr. 553].)

Second, defendant argues that Detective Birdsall's subjective belief on September 30, 2002, there had been an invocation of *Miranda* rights by defendant on September 27, 2002, requires suppression of the incriminating statements. Defendant argues: "Appellant's request to consult counsel, before answering questions, should also be deemed . . . unambiguous because both officers interrogating him *interpreted the request as a clear invocation* of his right to consult counsel. . . . [¶] Birdsall indicated he viewed appellant's request for counsel as an unequivocal request. . . . [¶] When hearing the request, Officer Ly also viewed it as an unambiguous invocation of his right to counsel, because Ly *told Birdsall that appellant had requested counsel.*" (Original italics.) (We note that Officer Ly testified defendant had not

requested counsel. Rather, according to Officer Ly, defendant was confused and the interview was not getting anywhere.)

■ Nonetheless, the subjective beliefs of Officer Ly and Detective Birdsall as to whether *Miranda* is applicable are irrelevant to the constitutional admissibility of evidence issue. The United States Supreme Court has repeatedly noted that officers' subjective opinions are irrelevant to *Miranda*-related issues. In *Moran v. Burbine* (1986) 475 U.S. 412, 423–424 [89 L.Ed.2d 410, 106 S.Ct. 1135], the Supreme Court discussed the effect of the failure of Rhode Island investigators to apprise the accused that an assistant public defender desired to be present during any interrogation. In the absence of any evidence the defendant knew of the assistant public defender's request to be present during the interrogation, the Supreme Court held, "But whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of [the defendant's] election to abandon his rights." (*Id.* at p. 423; accord *Poyner v. Murray, supra,* 964 F.2d at p. 1412.)

■ Further, the uncommunicated subjective opinion of an officer as to whether an individual being questioned is a suspect is irrelevant in terms of determining whether an accused is in custody for *Miranda* purposes. In *Stansbury v. California* (1994) 511 U.S. 318, 322–324 [128 L.Ed.2d 293, 114 S.Ct. 1526], the Supreme Court held, "It is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." (See *Thompson v. Keohane* (1995) 516 U.S. 99, 114, fn. 15 [133 L.Ed.2d 383, 116 S.Ct. 457]; *People v. Farnam* (2002) 28 Cal.4th 107, 180–181 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

■ In a similar vein, in *New York v. Quarles* (1984) 467 U.S. 649, 656 [81 L.Ed.2d 550, 104 S.Ct. 2626], the Supreme Court established a public safety exception to the *Miranda* rule under limited circumstances. The Supreme Court explained this rule was not subject to a requirement that public safety be the motivation for the on-scene inquiry concerning the location a firearm. The court held: "We hold that on these facts there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved. In a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception which we recognize today should not be made to depend on *post hoc* findings at a suppression hearing concerning the subjective motivation of the arresting officer. Undoubtedly most police officers, if placed in Officer Kraft's position,

would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect." (*Id.* at pp. 655–656, fn. omitted; *United States v. Newton* (2d Cir. 2004) 369 F.3d 659, 677–678.) The omitted footnote in the quotation in the immediately preceding sentence adverts to the holding in *Rhode Island v. Innis, supra,* 446 U.S. at pages 300–301 concerning when interrogation occurs for purposes of *Miranda* which noted, "Similar approaches have been rejected in other contexts. See *Rhode Island v. Innis, supra,* 446 U.S., at 301 (officer's subjective intent to incriminate not determinative of whether 'interrogation' occurred) . . . ." (*New York v. Quarles, supra,* 467 U.S. at p. 656, fn. 6.) The detectives' belief on September 30, 2002, that defendant had invoked his right to counsel does not require us or the trial court to accept their legal conclusion when other evidence indicates the invocation was ambiguous. (*People v. Peevy* (1998) 17 Cal.4th 1184, 1199 [73 Cal.Rptr.2d 865, 953 P.2d 1212] ["[I]t would be anomalous to hold that the applicability of the [*Harris v. New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]] rule depends upon the subjective intent of the interrogating police officer, when other applications of the *Miranda* rule generally do not turn upon the individual officer's subjective state of mind, but rather upon the accused's perception of his or her circumstances."]; *United States v. Doe* (9th Cir. 1997) 109 F.3d 626, 634 ["[T]he obligation to administer *Miranda* warnings depends on the objective circumstances surrounding a suspect's questioning, rather than the subjective intentions of law enforcement officials . . ."]; *Poyner v. Murray, supra,* 964 F.2d at p. 1412 [refusing to adopt a rule penalizing several officers for "erring on the side of even excessive caution" in concluding an invocation of the right to counsel had been made by the accused].) In the last analysis, the question of whether defendant unambiguously asserted his constitutional right to counsel is for the courts, not law enforcement officers, to decide. This analysis in the Fifth and Sixth Amendment context and is entirely consistent with the same rule of law in Fourth Amendment suppression of evidence jurisprudence. (*Devenpeck v. Alford* (2004) 543 U.S. 146, 152–153 [160 L.Ed.2d 537, 125 S.Ct. 588, 593–594]; *Whren v. United States* (1996) 517 U.S. 806, 813–814 [135 L.Ed.2d 89, 116 S.Ct. 1769].)

III.A.(4)–F.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante,* page 11.

## IV. DISPOSITION

The judgment is affirmed.

Armstrong, J., and Mosk, J., concurred.

A petition for a rehearing was denied August 3, 2005, and on July 21, 2005, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 2, 2005.