Filed 6/29/15  P. v. Belton CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C075998 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F08376) |
| v. | |
| CASSONDRA LADAWNYA BELTON, | |
| Defendant and Appellant. | |

A jury found defendant Cassondra Ladawnya Belton guilty of first degree murder, robbery, and car theft, and found true a robbery-murder special circumstance.  (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17), 211; Veh. Code, § 10851, subd. (a).)  The trial court sentenced defendant to prison for life without parole.  Defendant timely filed this appeal.

1

On appeal, defendant contends some of her pretrial statements should not have been introduced as evidence because they were involuntary, were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694]), and--to the extent that any of her claims were not raised in the trial court--her trial counsel was ineffective because there was no rational tactical reason not to move to suppress her statements on all possible grounds. Disagreeing, we shall affirm.

## BACKGROUND

Defendant was involved in robbing and killing the victim, Baljinder Kumar, on or about December 16, 2010. Defendant and two juveniles, Kevin Hjellum (also referred to as Nathaniel L. or Nate) and Monica Elizabeth Ortiz, discussed robbing Kumar, a drug dealer, in his car. Kumar was strangled and his body was left near Hood-Franklin Road in rural Sacramento County.[1]

Defendant spoke to a California Highway Patrol (CHP) officer when she was arrested in Oroville while driving Kumar's car on December 19, 2010, the day after Kumar's body was found. She told the officer that her father gave her the car to drive. Early the next morning she told the same story to Sacramento detectives. In a later interrogation that day, she admitted strangling Kumar and helping to dump his body.

At trial, defendant testified she did not kill Kumar. Although she knew Hjellum and Ortiz discussed robbing him during a fake drug deal, she did not take them seriously. However, she got into Kumar's car with them, and put a belt around Kumar's neck, because she thought Hjellum was going to hit her with a rock. Then Hjellum jumped in the back and began to strangle Kumar. At that point, defendant got out of the car and

---

[1] Ortiz and Hjellum, originally codefendants, each pled no contest to second degree murder before defendant's suppression motion was heard. It does not appear that Ortiz ever appealed, and we previously denied Hjellum's request to deem his belated notice of appeal to be timely. (See *People v. Hjellum*, 3 Crim. No. C075886.)

2

walked away. She looked back and saw Ortiz waving toward her, so she returned, to find Kumar dead or in extremis. She obeyed Hjellum's direction to drive the car away, and watched the other two roll his body down a hill. She accepted money they found in Kumar's car, totaling "a couple thousand" dollars. Defendant was scared when questioned and lied to the officers.

## DISCUSSION

On appeal, defendant claims (1) the detectives undermined her *Miranda* waiver, and (2) her statements were involuntary. Recognizing that neither of these claims was directly presented to the trial court, she contends she may raise the voluntariness claim absent a trial court objection, and that her trial counsel was ineffective to the extent he failed to preserve her claims. Although the Attorney General appears to be correct that these new claims are forfeited, "it is within our discretion to address a forfeited claim to avoid the inevitable ineffective assistance of counsel claim." (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1028.) We reach defendant's claims.

I

*The Suppression Hearing*

The People moved in limine to admit all of defendant's statements to the police. Defense counsel filed a counter motion to exclude only the portion of the last interrogation after she mentioned an attorney, which counsel characterized as a request for an attorney that had been ignored by the detectives. Defendant's more inculpatory statements were made after she mentioned an attorney.

The issue was submitted to the trial court based on transcripts of the interrogations, not the recordings later played at trial. This means the trial court was not asked to make any determination regarding physically intimidating conduct by the officers or the effect of any of their conduct on defendant's demeanor (e.g., whether she was crying, recoiling from them, etc.).

3

During the last interrogation, one detective emphasized that they wanted to know who had done what and what the intentions had been, given that some of the circumstances suggested torture. He added that they had heard what other people had said but wanted to know defendant's side. Defendant replied: "Uh, well I don't know if this is a question for you guys or if I should ask an attorney or something, but, um, how do you go about sentencing us if you - if you can't exactly find out . . . who actually killed him?" The detectives then continued with the interrogation, and defendant freely answered questions, detailing the planning of the robbery, the killing, and its aftermath.

At the in limine hearing, defense counsel represented that defendant was young, lacked sophistication, and had no criminal record, and contended her reference to an attorney invoked her right to counsel. Defense counsel also contended that when the detectives segued from discussing the car theft to the killing, defendant should have been re-*Mirandized*.

The trial court ruled defendant had been properly *Mirandized*, did not invoke her right to counsel, and "continued talking . . . for a good while openly and, apparently [in] a very cordial conversation, said a few things." Defendant was not "forced to [talk] . . . without certain warnings or put in any kind of duress."

II

*Defendant's Claims*

Defendant contends the detectives undermined her *Miranda* waiver and through their purported misconduct rendered her statements involuntary. We disagree.[2]

---

[2] Defendant does not challenge the finding that she did not invoke her right to counsel. (See *Davis v. United States* (1994) 512 U.S. 452, 458-459 [129 L.Ed.2d 362, 371]; *People v. Nelson* (2012) 53 Cal.4th 367, 376-384 (*Nelson*).)

4

A.  Miranda *Waiver*

A suspect's waiver of *Miranda* rights must be knowing, intelligent, and voluntary, but may be expressed or implied.  (See *Nelson, supra*, 53 Cal.4th at pp. 374-375; *People v. Roquemore* (2005) 131 Cal.App.4th 11, 22-23.)  "On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence."  (*People v. Williams* (2010) 49 Cal.4th 405, 425 (*Williams*).)

The record shows defendant was *Mirandized* before the first recorded interrogation, and re-*Mirandized* at the beginning of the second recorded interrogation.[3] After being told her rights at the beginning of the second interrogation, defendant spoke freely with the officers at length.  She asked the officers questions, and listened to their questions.  In short, this appears to have been a mundane, routine, interrogation.  Indeed, the fact defendant was advised of and waived her rights multiple times bolsters the view that she knowingly and voluntarily waived them.  (Cf. *Williams*, *supra*, 49 Cal.4th at p. 434 ["After a valid *Miranda* waiver, readvisement prior to continued custodial interrogation is unnecessary 'so long as a proper warning has been given, and "the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver" ' "].)

Defendant contends the "tactics" of the police vitiated her waiver, specifically, that the detectives suggested "her jury would infer guilt from her failure to speak with the police," thereby telling her that her "right to remain silent was meaningless."  She likens this to cases where the *Miranda* rights are not clearly communicated or are negated by official conduct.

_____

[3]  At trial there was testimony that defendant had also been *Mirandized* by the CHP officer when she was arrested, said she understood her rights, and first told the false story about receiving Kumar's car from her father.

5

For example, defendant emphasizes *United States v. Harrison* (1994) 34 F.3d 886, at page 891 (*Harrison*) which states in part: "Although the agents thinly veiled their implied message behind a rhetorical question, Harrison could only conclude that she might suffer for her silence." Harrison opened the door of her home to find some 15 federal agents with guns drawn, who searched her house and arrested her and her companion. She was advised of her *Miranda* rights, but after a brief silence, an agent described the evidence against her and said that she could face a 20-year sentence. The agent then asked whether Harrison thought it would be better if the judge were told that she had cooperated or had not cooperated. Harrison said it would be better if she talked to the agents and they told the judge she had cooperated, then she made an inculpatory statement. (*Id.* at p. 890.) In reversing her conviction, the *Harrison* court emphasized the impropriety of the implication that the agents would tell the judge or prosecutor that Harrison had not cooperated if she exercised her right to silence. (*Id*. at pp. 891-892 ["there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor"].) Defendant also points to *Doody v. Ryan* (9th Cir. 2011) 649 F.3d 986, a habeas corpus case holding that a state court had unreasonably found a valid *Miranda* waiver. There, the rights were read in a confusing manner, so that "[w]hat began as the reading of a single-page *Miranda* form morphed into a twelve-page exposition *that negated the intended effect* of the *Miranda* warning." (*Id*. at p. 991, italics added; see also *id.* at pp. 1024-1028 (conc. opn. of Kozinski, C.J.) ["unlike voluntariness [which may be debatable], 'a warning is a clearcut fact' "; the officer muddled the warnings by suggesting Doody was entitled to a lawyer only if he were involved in the crime, not merely suspected of involvement, therefore "The warning given in this case was far worse than no warning at all"].)

But *Harrison* and *Doody* are inapposite:  Here, defendant chose to waive her right to silence and speak to the officers long before any of the officers' challenged remarks were made.  There was no infirmity at the time the *Miranda* warnings were given, as in *Harrison* and *Doody*.  Defendant contends the references to her silence vitiated her *Miranda* advisement:  "By suggesting . . . that her jury would infer guilt from her failure to speak with the police, Detective Tracy effectively told [defendant] that her right to remain silent was meaningless."  But Detective Tracy said no such thing.  He said the jury would *speculate* about her intentions if she did not explain herself.  He also said it would look bad for her if the only statement the jury had from her was her statement to the CHP and earlier to the detectives, to the effect that her father gave her Kumar's car to drive.  That was an accurate and common sense observation; at the time the officer made the statement the police had caught one of defendant's relatives trying to dispose of Kumar's belongings from her house.  They knew defendant's claim that her father gave her the car was false.  We see nothing about pointing out this circumstance that would undermine defendant's ability to stand on her rights and end the interrogation.

Defendant contends the officers "openly confronted her" with information that in between the two recorded interrogations, they had searched her home, caught a relative trying to dispose of items belonging to Kumar, and told her that her juvenile companions had been talking and said nobody intended to kill Kumar.  Further, a detective suggested the killing was a mistake and an unfortunate accident.  All of this is correct.  Also, in response to an inquiry from defendant about determining her sentence, the detective replied he could not say, and that was for the prosecutor and the judge to determine.  His job was to gather the facts impartially.  Shortly thereafter, he told her the only person who could explain defendant's state of mind was defendant, which is why the detectives came to Oroville from Sacramento to talk to her.  She replied, "So maybe present that question, I'll be able to tell you what happened."  They asked her what happened and she told them about the planning and execution of the robbery and disposal of the corpse.

Once *Miranda* rights are clearly communicated, as they were here, and are waived by the suspect, officers may continue with a non-coercive custodial interrogation unless and until the suspect invokes her or his right to silence or right to counsel, and in this case defendant impliedly concedes she did neither. (See fn. 2, *ante*.) After all, "it is the *Miranda* warnings themselves, which—when given to the suspect and waived prior to questioning—are ' "sufficient to dispel whatever coercion is inherent in the interrogation process." ' " (*Nelson*, *supra*, 53 Cal.4th at p. 377.) We fail to see how any or all of defendant's points about the successful interrogation techniques used in this case *after* defendant knowingly and freely waived her *Miranda* rights undermined her knowledge of those rights or implicated her decision to waive them.

Accordingly, assuming the point is not forfeited, defendant has not demonstrated that her *Miranda* waiver was vitiated by the detectives.

B. *Voluntariness*[4]

"The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary, ' "[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne." ' [Citation.] Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.] ' "On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review." ' " (*People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*).)

---

[4] As will become evident, several of the sub-points raised by defendant as to her *Miranda* waiver are also used by her to attempt to show her statements were involuntary. We will not duplicate all of our analysis of these common points.

"Here, there is no dispute as to the historical facts, no claim of physical intimidation or deprivation, and no assertion of coercive tactics other than the contents of the interrogation itself." (*People v Holloway* (2004) 33 Cal.4th 96, 114.) Only the transcripts were submitted for the trial court's consideration. Defendant partly contends that the actions of the officers "and the surrounding circumstances" rendered her statements involuntary. She emphasizes that she had asked about her sentence, suggesting that this equated to a request for legal advice, that is, for a *lawyer's* advice. However, she does not contest the trial court's ruling that her question was not an unequivocal invocation of the right to counsel. She faults the officers for wrongly suggesting her intent was at issue, although this case was prosecuted as a felony-murder case. But "[t]he policeman is not a fiduciary of the suspect. The police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible." (*United States v. Rutledge* (7th Cir. 1990) 900 F.2d 1127, 1130.)

In any event, under current standards, "telling a suspect falsehoods regarding the status of the case against him is widely accepted." (3 Ringel, Searches & Seizures, Arrests and Confessions (2d ed. 2011) Voluntariness of Confessions and Admissions, § 25:8, pp. 25–38; see 2 LaFave, et al., Criminal Procedure (3d ed. 2007) Interrogation and Confessions, § 6.2(c), pp. 629-633.) "Where the deception is not of a type reasonably likely to procure an untrue statement, a finding of involuntariness is unwarranted." (*People v. Farnam* (2002) 28 Cal.4th 107, 182; see 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 69, p. 760.) Here, the conduct was not likely to induce a *false* confession. (Cf. *People v. Steger* (1976) 16 Cal.3d 539, 550.)

Defendant's reliance on *People v. Cahill* (1993) 5 Cal.4th 478 is unpersuasive. In that case, our Supreme Court accepted for purposes of argument a lower court's determination that various police statements, including a misstatement about felony

9

murder, amounted to an implied promise of lenity, rendering a confession involuntary (*id*. at pp. 483-485). The high court did *not* hold that misstating the law about felony murder was coercive in all cases. Instead, the statements by the officers must be assessed to determine whether they would be likely to cause a false confession. (*People v. Farnam*, *supra*, 28 Cal.4th at p. 182.) The transcript herein contains no such statements.

Similarly, defendant's claims that the officers improperly suggested the jurors would infer guilt if defendant did not talk and minimized the crime by suggesting it might have been an accident are unpersuasive, because such conduct would not tend to coerce an innocent person to admit to murder. Further, suggesting the killing was an accident does not compel a finding that defendant's will was overborne. As held in an analogous case, "suggestions that the . . . homicide might have been an accident, a self-defensive reaction, or the product of fear, were not coercive; they merely suggested possible explanations of the events and offered defendant an opportunity to provide the details of the crime. This tactic is permissible." (*Carrington*, *supra*, 47 Cal.4th at p. 171; see *Williams*, *supra*, 49 Cal.4th at p. 444 ["suggestions made by the interrogating officers that defendant may not have been the actual killer, or may not have intended that the victim die, were not coercive"]; *People v. Holloway, supra*, 33 Cal.4th at p. 116 ["suggestions that the killings might have been accidental or resulted from an uncontrollable fit of rage during a drunken blackout, and that such circumstances could 'make[] a lot of difference,' fall far short of being promises of lenient treatment in exchange for cooperation"].) " ' "Once a suspect has been properly advised of his [or her] rights, he [or she] may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect." ' " (*Carrington*, *supra*, 47 Cal.4th at p. 170.)

10

Nor did the detectives improperly suggest defendant did not have a realistic right to silence, because of the jury's eventual view of her *false* statements about how she got the car. "[T]here is nothing improper in pointing out that a jury probably will be more favorably impressed by a confession and a show of remorse than by demonstrably false denials. 'No constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence.' [Citation.] Absent improper threats or promises, law enforcement officers are permitted to urge that it would be better to tell the truth." (*Williams*, *supra*, 49 Cal.4th at p. 444.)

Nor, contrary to defendant's claim were there any improper promises of lenity. While promises of lenity in exchange for a confession may render a particular statement involuntary (see, e.g., *In re Shawn D*. (1993) 20 Cal.App.4th 200, 214), mere exhortations to tell the truth are permissible. (See *Carrington*, *supra*, 47 Cal.4th at p. 174 ["The interviewing officers did not suggest they could influence the decisions of the district attorney, but simply informed defendant that full cooperation might be beneficial in an unspecified way. Indeed, defendant understood that punishment decisions were not within the control of the police officers"]; *People v. Howard* (1988) 44 Cal.3d 375, 398 [" ' "[w]hen the benefit pointed out by the police . . . is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made' "].) Here, the detectives suggested the prosecutor, judge, or jury would speculate about defendant's silence, given her prior lies. The detectives never mentioned particular outcomes, and disavowed any control over the punishment defendant might receive. Their statements are more properly characterized as urging defendant to tell the truth rather than making improper promises of lenity, or threats of penal harm if defendant did not keep talking.

Although not directly asked to rule on voluntariness, the trial court found that defendant was not "put in any kind of duress." That finding, which equates to a finding of voluntariness, is amply supported by the record.

11

## DISPOSITION

The judgment is affirmed.

                                                   DUARTE         , J.

We concur:

      RAYE           , P. J.

      HOCH          , J.