[No. C051632. Third Dist. Sept. 27, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL SIMONS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part III of the Discussion.

## COUNSEL

Charles M. Bonneau, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Mary Jo Graves and Michael P. Farrell, Assistant Attorneys General, Carlos A. Martinez and Marcia A. Fay, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, Acting P. J.**—Defendant Michael Simon's 17-year-old wife was brutally slain only four months after their marriage. She was shot twice in the chest by a shotgun at close range and left in the bushes. Her car had been burned. A jury found defendant guilty of first degree murder with special circumstances of lying in wait (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(15)),[1] assault with a deadly weapon (§ 245, subd. (a)(1)), and arson (§ 451, subd. (d)). The jury also found defendant personally discharged a firearm in the commission of the murder (§ 12022.53, subd. (d)). The trial court sentenced defendant to an aggregate term of life without the possibility of parole, plus 25 years to life.

---

[1] Undesignated statutory references are to the Penal Code.

On appeal, defendant contends the trial court erred in admitting the statement he made to police during an interview. He also contends the trial court erred prejudicially by not instructing the jury that he could not be found guilty of the arson of his own property. In the published portion of the opinion, we reject these contentions. Defendant also contends the trial court erred by instructing the jury with CALJIC No. 6.11 on conspiracy. We reject this contention in the unpublished portion of the opinion. We therefore affirm the judgment.

## BACKGROUND

Jenna Nannetti lived in Livermore with her grandmother, Linda Nannetti, who had raised Jenna and was her legal guardian.[2] To provide money for Jenna's college education, Linda had taken out a $50,000 insurance policy on Jenna, with Linda as the sole beneficiary.

In June 2002, with Linda's consent, Jenna was legally emancipated and married defendant. Jenna was 17 years old. Defendant moved into Linda's house and Linda bought a Ford Mustang for Jenna and defendant as a wedding present. Linda registered the Mustang in Jenna's and/or defendant's name.

About a month later, defendant moved out and told Jenna he wanted a divorce. Angry that Jenna did not want the divorce, defendant became verbally abusive and, at one point, threatened to kill her. He also told an acquaintance that he would "take care of her." After the separation, Linda registered the Mustang in her own name.

Defendant called Jenna on October 6, 2002, and that evening, she left in the Mustang to meet defendant and discuss the divorce. The Mustang was found burned completely through in the early morning hours of October 7, 2002. Jenna's decomposing body was found in the bushes on Lower Jones Island in the Delta on October 19, 2002. She had two shotgun wounds to the chest, consistent with the shotgun being fired at a range of between one and three feet. The shotgun shell found at the scene was identified as being fired from a Remington shotgun that was found near an Oakland estuary.

In March 2003, Jeffery Hamilton and Katherine Belflower were arrested in connection with the attempted murder of Aspen Lum. While Hamilton was being questioned, he told police that defendant had killed Jenna. Hamilton testified at defendant's trial as part of a plea agreement and explained how the killing occurred.

---

[2] Because the victim and her grandmother have the same surname, we refer to them by their given names for clarity. We intend no disrespect.

When defendant and Jenna separated, defendant moved in with Belflower, with whom he had a sexual and romantic relationship. Defendant was upset with Jenna because she kept calling and saying she wanted to save the marriage.

In September 2002, defendant said he wanted to kill Jenna. Defendant continued to mention it and started coming up with a plan. Defendant believed he was the beneficiary of Jenna's insurance policy, and he and Belflower planned to buy a house together with the insurance proceeds. Since neither defendant nor Belflower had a car, they asked Hamilton to assist in their plan by driving his Dodge Neon. In exchange, Hamilton could live in the house they planned to buy.

About a week before the killing, Hamilton realized defendant and Belflower were serious about killing Jenna. Belflower regained a Remington shotgun she had previously given away and defendant bought six or seven boxes of ammunition. Defendant and Belflower planned to hit Jenna on the head with a bat and take her to a place in the Delta they called Whiskey Slough where defendant would kill her with the shotgun. They would then drive part way back in Jenna's car, light the car on fire, and then Hamilton would drive them all back the rest of the way. Defendant, Belflower and Hamilton went to Whiskey Slough twice to test-fire the shotgun.

On October 6, 2002, defendant called Jenna and told her he wanted to talk about the divorce and getting back together. Jenna came over to Belflower's house that evening. Jenna and defendant play-wrestled awhile and then sat on the front porch. Belflower was crouched in the hallway holding a baseball bat. Hamilton heard a thud and Jenna yell, "You bitch." Jenna was bleeding from her head. Defendant held Belflower back and apologized to Jenna. Belflower got a towel from the house and defendant gave it to Jenna. Defendant then offered to drive Jenna home and he and Jenna got into the Mustang.

Jenna wanted to go to the hospital but defendant convinced her to go to Whiskey Slough by telling her that Belflower would be there and she could beat Belflower up. Defendant stopped for gas so the Mustang would have a full tank when he set it on fire. In the meantime, Belflower got the shotgun and ammunition and she and Hamilton drove to Whiskey Slough. They parked on the upper part of the levee road and waited. Defendant and Jenna arrived shortly thereafter and parked on the lower part of the levee road, about 60 feet away from Hamilton.

Defendant got out of the Mustang and walked up the embankment to Hamilton's Neon. Belflower gave defendant the shotgun and ammunition and defendant walked back down the embankment to Jenna. Jenna turned toward defendant and defendant fired the shotgun. Jenna fell on the ground and yelled, "Please, Mike, don't." She was on her back trying to push herself away when defendant fired a second time. Jenna screamed and defendant fired again.

As Belflower and Hamilton got out of the Neon and started walking down the embankment, defendant fired two more shots. When Hamilton saw Jenna, her chest was blown open and the skin on her neck was peeled back. Hamilton took her wrist to feel for a pulse and she let out a "gurgly" breath. When Hamilton jumped back, defendant and Belflower laughed at him. They looked for shotgun shells and defendant dragged Jenna's body into the bushes.

Defendant and Belflower got into the Mustang and Hamilton got into the Neon. They both drove to Mountain House Bar, a place Jenna had been to before. Defendant lit a road flare and put it in the Mustang in an attempt to burn any evidence that he had been in the Mustang. As the three drove off in the Neon, Hamilton realized there was something wrong with his car. He pulled over and saw he had a flat tire. Defendant and Belflower hid the bat and shotgun, and then borrowed a jack from a nearby homeowner.

A week or two later, defendant and Belflower borrowed the Neon so they could go "make out." Hamilton later found out they had gone to retrieve the shotgun. Defendant had taken the shotgun to a pier in Oakland, tied it to a bag of rocks, and thrown it in the water.

Defendant was arrested and interviewed by police. In his version of the events, it was Hamilton who shot Jenna. Defendant did not testify at trial.

## DISCUSSION

## I

Defendant contends the trial court erred in admitting the statements he made during his March 4, 2005, interview with police. He contends his statements were unlawfully elicited in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*), after he had invoked his right to consult an attorney.

" 'In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda v. Arizona, supra,* 384 U.S. 436, we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence. [Citation.] Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we " 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." [Citations.]' " (*People v. Whitson* (1998) 17 Cal.4th 229, 248 [70 Cal.Rptr.2d 321, 949 P.2d 18].)

■ Once a suspect receives *Miranda* warnings, he "is free to exercise his own volition in deciding whether or not to make a statement to the authorities." (*Oregon v. Elstad* (1985) 470 U.S. 298, 308 [84 L.Ed.2d 222, 232, 105 S.Ct. 1285].) If he requests the assistance of counsel at any time during the interview, " 'the interrogation must cease until an attorney is present.' " (*Edwards v. Arizona* (1981) 451 U.S. 477, 485 [68 L.Ed.2d 378, 386, 101 S.Ct. 1880], quoting *Miranda, supra,* 384 U.S. at p. 474 [16 L.Ed.2d at p. 723].)

Defendant was interviewed by Detectives Annette Mondavi and Javier Ramos at the department headquarters in Stockton, after being arrested and transported from Pleasanton. The interview was videotaped and provided, along with a transcription of it, to the trial court at a hearing on defendant's motion to exclude his statement. We have reviewed the transcription of the interview provided to the trial court.[3]

The interview began with Detective Mondavi reading defendant his *Miranda* rights. Defendant answered that he understood his right to remain silent and his right to have an attorney present. Although defendant gave no audible response to the question of whether he understood his right to have counsel appointed free of charge, Mondavi testified that defendant was nodding his head throughout the advisement.

Defendant began by explaining that Belflower and Hamilton were in jail because they tried to kill a girl, Aspen, that liked him and he had begun dating. Mondavi then told defendant she wanted to talk about Jenna Nannetti. Mondavi told defendant she had been investigating the case and knew a lot about what happened, she knew about his involvement, and she wanted defendant to tell the truth. She told defendant she knew about the flat tire, knew where he hid the shotgun, knew where the baseball bat was thrown and knew to which house he went, and she implied she knew much more. Mondavi made it clear to defendant that there was no doubt in her mind

---

[3] The videotape was not included in the record on appeal.

about what happened and what defendant did, she just wanted to know why and to get his side of the story. When defendant began by claiming he did not know the exact day he last saw Jenna, Detective Ramos told him they had already talked to Belflower and Hamilton and to "cut the crap out" because "that's not gonna work."

Defendant then said Jenna came to Belflower's house where he was living at the time. Defendant and Jenna were horseplaying, and then stopped and Jenna kissed him.[4] They were sitting on the porch when Belflower came out and hit Jenna with something. Defendant denied the attack was planned, although both detectives repeated that they knew what happened and did not want to hear lies. Defendant said he got a towel for Jenna's bleeding wound and gave her money for gas. Defendant said he got into a car with Belflower and Hamilton and fell asleep. He said when he woke up, it was dark and they had stopped at Whiskey Slough.

At this point, the following exchange took place:

"Det. #1 [Mondavi]: We're . . . we're not buying any of that story. I mean, does it show?

"Simons: No. No, not at all.

"Det. #2 [Ramos]: You believe we were buying it?

"Simons: No, I'm telling you . . . I'm telling you guys the complete truth.

"Det. #2: Oh . . .

"Det. #1: Well, then what did you stop for?

"Simons: Huh?

"Det. #1: What . . . what . . . tell me what else.

"Simons: It's just hard. I'm . . . I'm dead serious, it's . . .

"Det. #1: Go ahead and tell us.

"Simons: How long would it take for a lawyer to get here for me?

---

[4] At this point in the interview, there was a brief discussion about Aspen's current whereabouts. The subject then returned to Jenna.

"Det. #1: That's up to you. Do you want an attorney right now?

"Simons: How long would it take if I said yeah?

"Det. #1: Then I'm gonna stop your questions if you want an attorney. Then the choice is yours.

"Simons: I mean, but how long would it take?

"Det. #2: I have no idea. I mean, you . . . you would be the one to know if . . . if . . . I mean, you would have to call someone and . . . and have . . . have, you know, have somebody show up.

"Simons: I can't . . . I can't afford one.

"Det. #2: Well, then . . . then like . . . like my partner said when she read you your rights. . . .

"Simons: One will be appointed to me.

"Det. #2: . . . the court will appoint one to you.

"Simons: About how long with [*sic*] that take? When . . .

"Det. #2: When you go to court.

"Simons: . . . I go to court?

"Det. #1: Um-hum. When you go to court, one will be appointed to you.

"Det. #2: But we gotta make . . . we gotta make sure you want to talk to us cuz we only talk to people that want to talk to us. Okay? We already talked to Jeff [Hamilton]. He wanted to talk to us. We've already talked to Katie [Belflower]. She wanted to talk to us. And those are the only people that we've talked to. So, we gotta make it perfectly clear if you don't want us to . . . if you don't want us to talk to you anymore, then we'll stop. But, once again Michael, you . . . you . . . you have to be honest with us because we have so many of the facts and then what you're telling us is . . .

"Simons: I'm being honest with you.

"Det. #2: Well, the story that you're telling us, the facts are gonna contradict it and they already do.

"Simons: No. I'm telling you guys the complete truth.

"Det. #2: Do you wanna continue talking to us?

"Simons: Yes I do.

"Det. #2: Okay.

"Simons: Anyways, there was . . . gunshots [*sic*] . . . and . . . I didn't know what to think then . . . ."

The interview continued and defendant continued providing his version of the events, which varied but never included an admission that he fired the fatal shots. He also took the detectives to the bridge where he had disposed of the gun.

Defendant asserts he "made a more than sufficient invocation of the right to remain silent" and that "[h]is only request for information was when an attorney could be provided." He further contends the detectives were purposely vague in responding to his inquiry. We disagree.

"The applicability of the ' "rigid" prophylactic rule' of *Edwards* requires courts to 'determine whether the accused actually invoked his right to counsel.' [Citation.] To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. [Citation.] Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' [Citation.] But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [the comment does] not require the cessation of questioning. [Citations.] [¶] Rather, the suspect must unambiguously request counsel. As we have observed, 'a statement either is such an assertion of the right to counsel or it is not.' [Citation.] Although a suspect need not 'speak with the discrimination of an Oxford don,' [citation], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect. [Citation.]" (*Davis v. United States* (1994) 512 U.S. 452, 458–459 [129 L.Ed.2d 362, 371, 114 S.Ct. 2350], italics omitted (*Davis*).)

Applying these rules, we conclude defendant did not clearly and unequivocally request an attorney so as to require the detectives stop their questioning. In *People v. Crittenden* (1994) 9 Cal.4th 83 [36 Cal.Rptr.2d 474, 885 P.2d 887], our Supreme Court held that the defendant's question, " 'Did you say I could have a lawyer?' " was not an unequivocal request for an attorney and was not an invocation of *Miranda* rights. (*Id.* at pp. 123, 130–131.) Similarly in *People v. Johnson* (1993) 6 Cal.4th 1 [23 Cal.Rptr.2d 593, 859 P.2d 673], the court held the defendant's statement, " 'Maybe I ought to talk to my lawyer, you might be bluffing, you might not have enough to charge murder' " was not a sufficient invocation. (*Id.* at pp. 27, 30, overruled on other grounds in *People v. Rogers* (2006) 39 Cal.4th 826, 878–879 [48 Cal.Rptr.3d 1, 141 P.3d 135].)

Defendant's statements in this case are legally indistinguishable from the statements in *People v. Crittenden, supra,* 9 Cal.4th 83, and *People v. Johnson, supra,* 6 Cal.4th 1, which were found insufficient to constitute an unequivocal assertion of the right to counsel. His questions regarding how long it would take for an attorney to get there if he asked for one would lead a reasonable officer to understand only that defendant *might* want an attorney if it would not take too long, which is not enough to require cessation of the interrogation. (*Davis, supra,* 512 U.S. at p. 459 [129 L.Ed.2d at p. 371].)

*Soffar v. Cockrell* (5th Cir. 2002) 300 F.3d 588 is almost squarely on point. There, defendant's questions on "whether he should get an attorney; how he could get one; and how long it would take to have an attorney appointed" were held to be equivocal statements not amounting to requests for appointment of an attorney. (*Id.* at pp. 593–596.)

Moreover, although the United States Supreme Court in *Davis* declined to require officers to clarify ambiguous or equivocal statements about the right to counsel, the court explained that officers are permitted to "clarify" whether a suspect comprehends or waives his *Miranda* rights where the invocation of rights is ambiguous. (*Davis, supra,* 512 U.S. at p. 461 [129 L.Ed.2d at p. 373]; see also *People v. Johnson, supra,* 6 Cal.4th at p. 27; *People v. Carey* (1986) 183 Cal.App.3d 99, 103 [227 Cal.Rptr. 813].) Thus, there was nothing inappropriate about the colloquy following defendant's inquiry, which was not misleading and which verified that defendant wished to continue the interview without an attorney present.

■ Viewed individually, and as a whole, defendant's questions and statements did not constitute a sufficiently unequivocal invocation of his right to have an attorney present during questioning to require cessation of the interrogation. (See *People v. Stitely* (2005) 35 Cal.4th 514, 535–536 [26 Cal.Rptr.3d 1, 108 P.3d 182]; *People v. Gonzalez* (2005) 34 Cal.4th 1111,

1126–1127 [23 Cal.Rptr.3d 295, 104 P.3d 98]; *People v. Sapp* (2003) 31 Cal.4th 240, 268 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Cunningham* (2001) 25 Cal.4th 926, 993 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Roquemore* (2005) 131 Cal.App.4th 11, 24–25 [31 Cal.Rptr.3d 214]; *People v. Scaffidi* (1992) 11 Cal.App.4th 145, 152–154 [15 Cal.Rptr.2d 167]; *U.S. v. De La Jara* (9th Cir. 1992) 973 F.2d 746, 750; *Robinson v. Borg* (9th Cir. 1990) 918 F.2d 1387, 1391–1393; *Shedelbower v. Estelle* (9th Cir. 1989) 885 F.2d 570, 571–573.) Accordingly, defendant's statements were not the product of a *Miranda* violation and the trial court did not err in denying defendant's motion to exclude the statements on that ground.

## II

### Arson

Defendant argues the trial court improperly refused to instruct the jury that setting fire to one's *own* property is a defense to the charge of arson. Essentially, he reasons that there was evidence to support a finding that the car had been community property and because he had already murdered his wife, the car was his, so it was not arson for him to burn it. His argument is legally incorrect. As we shall explain, when defendant murdered his wife, he terminated his right to acquire her interest in the car. Assuming the trial court should have instructed as defendant wishes, any error is clearly harmless in light of the jury's finding that defendant committed murder and the undisputed facts that the burning of the car followed the murder.

Defendant was charged with arson under section 451, which provides: "A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property. [¶] . . . [¶] (d) Arson of property is a felony punishable by imprisonment in the state prison for 16 months, two, or three years. For purposes of this paragraph, arson of property *does not include one burning or causing to be burned his or her own personal property unless* there is an intent to defraud or *there is injury to another person or another person's structure, forest land, or property.*" (Italics added.)

During the jury instruction conference, the trial court addressed whether it was necessary to instruct the jury on community property. The court found it to be unnecessary because, even assuming the car was community property, defendant could not intentionally destroy it because his wife had an interest in it. Defendant claims this was error because his wife "was dead at the time the car was burned, therefore if the car was community property, her interest reverted to [defendant]."

The People maintain that the car was not community property. But even assuming the car was community property, any failure of the trial court to provide the jury with instruction that the car had to be the property of another, that the burning of one's own property is not arson, or with community property language is harmless.

■ Defendant's wife's interest in the community property did not automatically revert to defendant upon her death. Probate Code section 100 provides that "[u]pon the death of a married person, one-half of the community property belongs to the surviving spouse and the other half belongs to the decedent." When the community property is held with right of survivorship, it does pass on the death of one of the spouses to the survivor without administration. (Civ. Code, § 682.1.) But there was no evidence in this case that would even *suggest* that the car was held with right of survivorship, which requires an express declaration in the transfer documents and acceptance of such in writing by the grantee.

Moreover, the murder of a spouse by the other spouse severs the interest and terminates the right of survivorship. Thus, Probate Code section 251 provides: "A joint tenant who feloniously and intentionally kills another joint tenant thereby effects a severance of the interest of the decedent so that the share of the decedent passes as the decedent's property and the killer has no rights by survivorship. This section applies to joint tenancies in real and personal property, joint and multiple-party accounts in financial institutions, *and any other form of coownership with survivorship incidents.*" (Italics added.)

If defendant's wife died intestate or died testate (not having been murdered) and her will devised her property to defendant, community property could have passed to defendant with no administration, subject to exceptions and liability for debts.[5]

But once again, defendant's murder of his wife terminated any entitlement he may have had in his wife's share of any community property. Thus, a person who intentionally and feloniously kills the decedent is not entitled to any property, interest or benefit under the will of the decedent or by

[5] Probate Code section 13500 provides: "Except as provided in this chapter, when a husband or wife dies intestate leaving property that passes to the surviving spouse under Section 6401, or dies testate and by his or her will devises all or a part of his or her property to the surviving spouse, the property passes to the survivor subject to the provisions of Chapter 2 (commencing with Section 13540) and Chapter 3 (commencing with Section 13550), and no administration is necessary."

intestate succession.[6] (Prob. Code, § 250, subd. (a).) Instead, under such circumstances, the property interest passes as if the killer had predeceased the decedent. (Prob. Code, § 250, subd. (b); see also Prob. Code, § 253.) Thus, " '[t]he spouse who takes one-half of the community [property] interest under [such] circumstances which limit [him] to not profiting from [his] own wrong must take that interest as it existed the moment before the wrong was done.' " (*Aetna Life Ins. Co. v. Primofiore* (1978) 80 Cal.App.3d 920, 925 [145 Cal.Rptr. 922].)

Prior to defendant's wife's death, defendant and his wife had a present, existing and equal interest in all community property. (Fam. Code, § 751.) Each had equal ownership interest that, although undivided, is protected by criminal law from unilateral nonconsensual damage or destruction by the other marital partner. (*People v. Kahanic* (1987) 196 Cal.App.3d 461, 466 [241 Cal.Rptr. 722], citing Civ. Code, former § 5105 (now Fam. Code, § 751) [spouse criminally liable for harm to marital property under statute prohibiting damage to property " 'not his own' "]; see also *People v. Wallace* (2004) 123 Cal.App.4th 144, 149–150 [19 Cal.Rptr.3d 790], and cases cited therein.)

Thus, it follows that since the jury found defendant murdered his wife, defendant's interest in any community property was limited to what existed the moment before the murder. So even if the car was community property, defendant's wife had an equal interest in the property, which remained protected against defendant's crimes. Accordingly, any failure of the trial court to instruct the jury that the car had to be the property of another, that the burning of one's own property is not arson, or with community property language was harmless by any standard.

### III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[6] "As to community property, the intestate share of the surviving spouse is the one-half of the community property that belongs to the decedent under Section 100." (Prob. Code, § 6401, subd. (a).)

*See footnote, *ante*, page 948.

## DISPOSITION

The judgment is affirmed.

Nicholson, J., and Robie, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 3, 2008, S157560. Werdegar, J., did not participate therein.