Filed 1/13/16  P. v. Salamanca CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B254814 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. Nos. TA082067 & |
| v. | TA089492) |
| GUMARO SALAMANCA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Allen J. Webster, Jr., Judge.  Reversed and remanded with directions.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jason Tran and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Gumaro Salamanca of first degree murder, attempted willful, deliberate and premeditated murder, and shooting at an inhabited dwelling, and found true several firearm and gang allegations. The trial court sentenced him to 50 years to life in prison. On appeal, defendant offers several contentions, including that the trial court erroneously admitted a recording and transcript of a custodial interrogation conducted absent adequate *Miranda*[1] warnings, the court erroneously instructed on application of the natural and probable consequences doctrine as it applies to aider and abettor liability, and the prosecution committed misconduct. We agree the natural and probable consequences doctrine was misapplied, which necessitates conditional reversal for reconsideration of a portion of defendant's sentence. We otherwise affirm.

## BACKGROUND

Defendant is a member of the Compton Varrio 70 (CV70) street gang. On October 5, 2005, CV70 gang leader David Guerrero ordered several gang members driving in two cars to commit three shootings as part of a longstanding conflict between CV70 and "Piru," a rival gang. Following Guerrero's instructions, defendant drove several fellow CV70 members to a gas station, where two individuals exited his car and shot Charles Smith and Jazmine McKinney with two handguns and an AK-47 assault rifle. Both victims survived. Defendant then drove to Gibson Street, where someone in the car leaned out the front passenger window and shot at a house with the AK-47. Finally, he drove to a parked car containing Dewan Ferguson and Melvin Walker, members of the Leuders Park Piru street gang, a CV70 rival. Someone from his vehicle shot the Piru members with the AK-47. Ferguson survived but Walker was killed.

Seven months later, on May 12, 2006, defendant was interrogated about the October 5 shootings. At the beginning of the interrogation detectives asked him, "[W]e advised you of your rights, is that correct? . . . [W]e advised you of your rights, your *Miranda* rights." Defendant replied, "Yes, Sir."

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

2

Defendant denied being a CV70 member or knowing any members except for David Guerrero and Joe Toledo, each of whom he had seen only once. He denied having ever been at the scene of any shooting and denied knowing whether CV70 members referred to him by the gang moniker "Nappy." When asked whether he knew Danny Guerrero, David's brother, he admitted he had "seen [Danny] a couple of times" and that he had been to his house to play Xbox "two, or three times at the most," for "like an hour" at most. Defendant stated he could not remember what street the Guerrero house was on, when he had last played Xbox there, whether anyone from the house had ever driven his car when he played Xbox, or whether anyone had ever asked to drive his car.

On March 1, 2007, detectives interrogated defendant a second time. At the beginning of the interrogation, police advised defendant of his *Miranda* rights as follows: "[B]efore we get started I'm going to again so it's on, on the tape . . . advise you of your rights again. We'll go over that again here. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to an attorney before we talk to you and have them present while we talk to you. If you cannot afford to hire an attorney one will be appointed to represent you free of charge. *Okay, understanding that, those rights*, uh, we want to talk to you about . . . one day in particular and then possibly some other things but especially, uh, regarding October 5th of 2005. Do you have a problem, uh, with us talking, problem talking to us about things we want to ask you?" (Italics added.) When defendant failed to answer the question clearly, the officer said, "Are you willing to, again, based on the agreement we have, are you willing to cooperate with us and tell us what you know about the, October 5, 2005, yes or no?" Defendant replied, "Yes."

During the second interrogation, defendant stated he had "nothing to do with" CV70 but admitted CV70 members called him "Nappy," a name given to him by "some guy," a non-CV70 member, who he hardly knew and had not seen "for a long time." He knew Danny Guerrero, as they played Xbox together, including on October 5, 2005, the day of the shooting. On that day, other people arrived at the house after he did, but he could not remember their names. He did not associate with those people, but merely

3

played Xbox with Danny Guerrero. He was nevertheless ordered by a CV70 member whose name he did not know but whom he identified from a photograph as Jose Encisco, to "go for a ride," with defendant driving his own car.

Defendant left the house in his Honda with two passengers whose names he did not know, one in the front seat beside him and one in back. He later identified the one in back as CV70 member David Covarrubias. He could not describe the front passenger, even as to his ethnicity or age, and never spoke to him. During the drive, defendant was directed by someone on the phone. He at first denied knowing who directed him by phone, saying "it could have been anybody," but eventually admitted it was David Guerrero. David Guerrero informed defendant he (David) was following in a car with other CV70 members, and instructed him to pull over to a gas station.

When defendant stopped at the gas station, his passengers got out and he shortly thereafter "heard some gun shots." He did not see where the passengers were shooting because, he stated, he "was actually focused on, you know, on what was going on. I just, you know, kind of like turned back and when I turned back they were already getting inside the car. So at that point I was, I was thinking, you know, I should drive away or whatever. I don't know, like, it was just too much stuff that was coming through my mind."

Guerrero then told defendant to drive to a specific house and stop. When he did so, his passengers half-exited the car and shot at the house, after which defendant drove them back to the Guerrero house. Once there, he transferred to an SUV, accompanied by Alejandro Perez, who now had the AK-rifle, and was directed by David Guerrero to drive to a specified location. When he arrived, Perez shot Ferguson and Walker from defendant's car.

Throughout the interrogation defendant minimized his role in the shootings. He claimed he had gone to the Guerrero house only to play Xbox with Danny Guerrero (it was later revealed that Danny Guerrero was incarcerated in San Bernardino at the time of the shootings) and repeatedly stated he had not wanted to drive with CV70 members but was forced to at gunpoint. Defendant claimed not to have seen any gun until he was

4

already on the road and not to have seen any of the shootings, even those committed by his passengers from his vehicle, but merely heard shots. He was unable to identify either the passenger who sat in the front seat during the first drive or any type of gun used in the shootings, claiming he could not distinguish between a revolver or semiautomatic handgun because he said he did not "know about those revolvers," and could not tell if the passenger's gun was a pistol or rifle because the passenger "had it under his, his sweater or something." (Defendant later admitted the front seat passengers on both drives used an AK-rifle.)

Defendant was charged with the murder of Walker, the attempted murders of Smith, McKinney, and Ferguson, and shooting at an inhabited dwelling. (Pen. Code, §§ 664/187, subd. (a), 246.)[2] Gang enhancements were alleged as to all counts and gun use enhancements as to the murder and attempted murder counts. (§§ 186.22, subd. (b), 12022.53, subds. (b), (c), (d) & (e)(1).)

Defendant and Toledo were tried together. After defendant's motion to exclude evidence of the statements he made to police was denied, he testified he was not a gang member but admitted driving CV70 members to the three shootings on October 5, 2005. He did so not knowing at first that his passengers would shoot at anyone, believing they were merely out to get food. After the first shooting he "knew what was going to go down" during the second and third shootings, but was forced at gunpoint to continue driving.

A jury convicted defendant of murder and attempted murder for the shooting of Ferguson and Walker, and of shooting at an inhabited dwelling, and found the gun and gang allegations to be true. It acquitted him of the attempted murders of Smith and McKinney and was unable to reach a verdict as to the lesser charge of assault on them with a firearm (§ 245). The trial court declared a mistrial as to those charges and later dismissed them. The court sentenced defendant to 50 years to life in prison.

---

[2] All undesignated statutory references will be to the Penal Code.

Defendant appeals his conviction.[3]

## DISCUSSION

Defendant challenges his conviction on several grounds:  (1) His statements to the police should have been excluded as involuntary because they were obtained in violation of his *Miranda* rights; (2) gang evidence admitted at trial was unduly prejudicial; (3) the trial court erred in instructing on the natural and probable consequence doctrine and by rejecting his request for an instruction on second degree murder; (4) the prosecutor misrepresented the law on the defenses of duress and necessity; and (5) due process requires specific performance of a leniency agreement that the prosecution unilaterally breached.

### 1.   Admission of Statements Made to Police

Defendant contends statements he had made to police during the 2007 interrogation were inadmissible because they were obtained in violation of his *Miranda* rights, and were therefore involuntary.  We disagree.

"The Fourteenth Amendment to the federal Constitution and article I, section 15, of the state Constitution bar the prosecution from using a defendant's involuntary confession." (*People v. Massie* (1998) 19 Cal.4th 550, 576.)  The burden is on the prosecution to establish by a preponderance of the evidence that a defendant's confession was voluntary.  (*Ibid*.)  "[A]ny statement obtained from a criminal suspect by a law enforcement officer during custodial interrogation is potentially involuntary because such questioning may be coercive . . . ." (*People v. Neal* (2003) 31 Cal.4th 63, 79.)  Thus, in *Miranda*, "the United States Supreme Court laid down its now familiar rule" (*ibid*.) that "'a suspect [may] not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and,

---

[3] Toledo was also convicted, and we affirmed the conviction in *People v. Toledo* (Jan. 26, 2012, B220510) nonpublished opinion.  We take judicial notice of that opinion. (Evid. Code, § 452.)  Many of the issues here are identical to those raised in Toledo's appeal.

6

if indigent, to appointed counsel.'" (*People v. Dykes* (2009) 46 Cal.4th 731, 751.)  Once a suspect receives these advisements, he "is free to exercise his own volition in deciding whether or not to make a statement to the authorities." (*Oregon v. Elstad* (1985) 470 U.S. 298, 308.)  A waiver of the right to remain silent may be express or implied from the totality of circumstances, including the suspect's actions and words.  (*Berghuis v. Thompkins* (2010) 560 U.S. 370 [130 S.Ct. 2250, 2261-2264] (*Berghuis*); *People v. Whitson* (1998) 17 Cal.4th 229, 244-250.)

Moreover, "'[f]aced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda* [citation], either to ask clarifying questions or to cease questioning altogether.'" (*People v. Rundle* (2008) 43 Cal.4th 76, 115, disapproved on other ground by *People v. Doolin* (2009) 45 Cal.4th 390, 416, 421, fn. 22.)  Rather, in order to assert the right to counsel or the right to remain silent, a suspect must unambiguously invoke his right.  (See *People v. Stitely* (2005) 35 Cal.4th 514, 535; *People v. Simons* (2007) 155 Cal.App.4th 948, 957.)

"[T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." (*Fare v. Michael C*. (1979) 442 U.S. 707, 724-725 (*Fare*).)  The factors to be considered include the element of police coercion, the length and location of the interrogation, and the defendant's maturity, education, physical condition, and mental health.  (*People v. Massie*, *supra*, 19 Cal.4th at p. 576.)

"In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them.  [Citation.] Law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview.  [Citation.]  Rather, a valid waiver of *Miranda* rights may . . . be inferred from the defendant's words and actions." (*People v. Cunningham* (2015) 61 Cal.4th 609, 642.)  We evaluate "whether the *Miranda* waiver is

7

shown by a preponderance of the evidence to be voluntary, knowing and intelligent under the totality of the circumstances surrounding the interrogation." (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219.)

On appeal, "'the trial court's findings as to the circumstances surrounding the confession,'" its resolution of disputed facts and inferences, and its credibility determinations are upheld if supported by substantial evidence. (*People v. Holloway* (2004) 33 Cal.4th 96, 114; *People v. Dykes*, *supra*, 46 Cal.4th at p. 751.) However, "'the trial court's finding as to the voluntariness of the confession is subject to independent review. [Citations.] In determining whether a confession was voluntary, "[t]he question is whether defendant's choice to confess was not 'essentially free' because his will was overborne."'" (*People v. Holloway*, *supra*, 33 Cal.4th at p. 114.)

Here, *Miranda* advisements were given, and the totality of the circumstances shows that defendant understood his rights. He understood English well enough to answer investigators' questions cagily and more or less responsively, and nothing in the record suggests he was coerced into making his statements or somehow failed to understand his rights.

In fact, defendant has never contended he failed to understand his rights. He contends only that the prosecution bore the burden of *showing* he understood them, and argues it could not do if the officers failed to ask him if he understood. In essence, defendant argues there can be no voluntary waiver where a suspect has not been asked if he understands his rights. No authority supports such a requirement. On the contrary, "given the practical constraints and necessities of interrogation and the fact that *Miranda*'s main protection lies in advising defendants of their rights," *Miranda* rights may "be waived through means less formal than a typical waiver on the record in a courtroom." (*Berghuis*, *supra*, 560 U.S. at p. 385.) "*Miranda* does not require the interrogator to ask the suspect whether the latter understood each of the rights, although it is doubtless good police practice to do this when the circumstances permit." (*United States v. Hall* (2d Cir. N.Y. 1983) 724 F.2d 1055, 1059.)

8

Defendant argues his *Miranda* advisement was incomplete because the investigators failed to inform him he could stop questioning at any time. Again, there is no such requirement. *Miranda* demands only that a suspect be advised in the first instance that he has a right to remain silent. He need not be given the additional and largely superfluous advisement that he may invoke the right at any time.

The evidence supports the trial court's conclusion that defendant understood the consequences of his statement, having made it after being warned and reminded that it could be used against him, and defendant's decision to speak with the officers was a knowing, intelligent, and voluntary waiver of his rights.

## 2. Admission of Gang Evidence

### a. Gang Evidence

In his opening statement, the prosecutor, over defendant's objections, told the jury that CV70 had been involved in a gang war since 1998 with several Piru street gangs, one of which was Leuders Park. The war began when a CV70 member shot a Leuders Park member in the eponymous Leuders Park. The prosecutor reviewed some dozen retaliatory shootings that occurred over the ensuing years, leaving gang members on both sides and their relatives dead, including Ms. Rickey Jimenez and Horace Ferguson, an eight-year-old boy. The prosecutor told the jury, "the individuals in this gang I am talking about are these gentlemen right here," referring to defendant and Toledo, his codefendant.

Dewan Ferguson, one of the three surviving victims in this case, testified regarding the CV70/Leuders Park feud. He said his family's house had been shot up three times, and three of his cousins and two friends had been killed and his brother injured in feud-related shootings over the years. Corey Ferguson, an associate of Leuders Park, testified over defendant's objection that he witnessed the murder of eight-year-old Horace Ferguson by a CV70 member in 2003.

Detective Peter Hecht, the People's gang expert, discussed the several incidents of CV70 gang violence previously introduced by the prosecutor. He testified that in 1998, Manuel Castillo, a CV70 member, shot Paul Spencer, a Leuders Park member, in Leuders

9

Park.  Lavelle Macleary, a Piru member, then shot Castillo in the face.  Castillo killed Macleary a few weeks later.  Members of Piru then killed Castillo's father and wounded his uncle.  Later, Ms. Jimenez was murdered by two Black males while she was standing outside a car talking to CV70 leader Guerrero.  It was suspected in the community that Guerrero was the intended target of the shooting and that the murder was committed by members of the Ferguson family, several of whom belonged to Leuders Park.  Jimenez's brother retaliated by shooting Brandon Buckhalter, a Leuders Park associate, in 2003.  CV70 members then shot and killed Kreshon Irving, a Piru member; two men named Mr. Porter and Mr. Wilson; and Darryl White, a member of the Ferguson family; and conspired to kill a Mr. Patino and a Mr. Laura in 2005.

The trial court instructed the jury to consider the history of violence only to evaluate Hecht's opinion, not for the truth of the matter asserted.  It later instructed the jury in accordance with CALCRIM No. 1403, which enjoins the jury to "consider the evidence of gang activity only for the limited purpose of deciding whether:  The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements charged; OR [t]he defendant had a motive to commit the crimes charged. . . .  [¶]  You may not consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

### b.    Contention

Defendant contends the court should have excluded most of the gang evidence because it was irrelevant, cumulative and unduly prejudicial.  We disagree.

### c.    Legal Principles

Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact of consequence to the determination of an action.  (Evid. Code, § 210.)  Nevertheless, relevant evidence should be excluded if the trial court, in its discretion, determines that its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice.  (Evid. Code, § 352.)  In this context, unduly prejudicial evidence is evidence that would cause the jury to

10

"prejudge" a person on the basis of extraneous factors. (*People v. Zapien* (1993) 4 Cal.4th 929, 958.)

In a gang-related case, gang evidence is admissible to prove enhancement allegations and to establish the motive for charged crimes. (*People v. Williams* (1997) 16 Cal.4th 153, 193; *People v. Williams* (2009) 170 Cal.App.4th 587, 609.) But given its inflammatory impact, "[g]ang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense." (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.) "Thus, as [a] general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) But the trial court "must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury." (*People v. Albarran*, *supra*, at p. 224.)

Evidence of specific instances of a person's conduct is inadmissible when offered to prove his or her conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) But such evidence is admissible if relevant to prove some fact other than the defendant's disposition to commit a crime. (Evid. Code, § 1101, subd. (b).) "[E]vidence of prior bad acts always involves the risk of prejudice regardless of its probative value . . . ." (*People v. Humiston* (1993) 20 Cal.App.4th 460, 481.)

We review the trial court's decision on whether evidence, including gang evidence, is relevant and not unduly prejudicial for abuse of discretion. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal

11

*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]'" (*People v. Rodrigues*, *supra*, 8 Cal.4th at pp. 1124-1125.)

### d.      Analysis

Here, the historical shootings described by Hecht, Duwan Ferguson and Corey Ferguson, all of which took place before 2005, were directly relevant to the motive for the 2005 shootings, which were orchestrated by Guerrero, a CV70 leader who had himself been shot and was present when Ms. Jimenez was killed. The historical evidence was not unduly prejudicial, as none of it suggested defendant had participated in the earlier crimes. Moreover, the jury acquitted defendant of the attempted murders of Smith and McKinney and was unable to reach a verdict as to the lesser charge of assault on them with a firearm, indicating it was not inflamed by the historical gang evidence and had not prejudged defendant.

Acknowledging that in *People v. Toledo*, *supra*, we reached the same conclusion on the same evidence, defendant asks that we take a fresh look at the issue in light of the fact that he had no prior criminal history, whereas Toledo's criminal history was extensive. But just as Toledo's prior criminal history played no role in our analysis in the prior case, defendant's lack of such a history makes no difference here.

### e.      Prejudice

In any event, the gang evidence could not possibly have unduly prejudiced defendant, as he admitted every pertinent fact both to police and at trial. Defendant testified Guerrero was a CV70 leader, was incensed by the historical assaults on CV70 members and associates, and would use violence to enforce his commands. He admitted he associated with the gang and drove gang members to three shootings, and also that he knew beforehand that the third shooting would occur. Where there is "'at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result,'" the error is prejudicial. (*People v. Mower* (2002) 28 Cal.4th 457, 484, citation omitted.) Here, there is no such balance because there is every reason to believe the jury would have reached the same result even absent any

12

improperly admitted gang evidence. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [reversal is required under the federal Constitution unless the error was harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [state law error requires reversal only if it is reasonably probable that the error had an effect on the verdict].)

3.      **Admission of Gang Members' Statements**

The trial court admitted several wiretap and jailhouse recordings of CV70 gang members and associates discussing defendant and identifying him as "Nappy." Defendant contends this was error because the evidence was cumulative because he admitted to police and at trial that his nickname was Nappy. The argument is without merit. The issue addressed by gang members' use of the nickname was not whether it was truly his, but whether gang members used it. If they did, the jury could conclude it was a gang moniker and that defendant was a member of the gang. As defendant always denied he was a CV70 member, the evidence was relevant to establish gang membership.

4.      **Defendant's Conviction for First Degree Premeditated Murder May Have Been Based on the Improper Theory of Natural and Probable Consequences**

The prosecution argued to the jury that even if defendant and his passengers never intended to kill anyone, but only to "drive and blast some fools," "shoot up a car," or "shoot up the hood and be a big, tough gangster, but . . . hope nobody dies," defendant would still be guilty of murder as an aider and abettor under the natural and probable consequences doctrine. In accordance with this theory, the trial court instructed the jury that defendant could be found guilty of first degree murder if "a reasonable person in the defendant's position would have known that the commission of murder or attempted murder was a natural and probable consequence of the commission of assault with a deadly weapon."

However, after defendant's conviction our Supreme Court in *People v. Chiu* (2014) 59 Cal.4th 155 held that "[a]n aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine," because a perpetrator's distinguishing mental state for first- as opposed to second-degree murder—willfulness, premeditation and deliberation—"is uniquely subjective and

13

personal," i.e., not subject to vicarious adoption by an aider and abettor. (*Id*. at p. 166.) Therefore, aiders and abettors may be convicted of first degree premeditated murder only "based on *direct* aiding and abetting principles." (*Ibid*., italics added.)

Respondent concedes that in light of *Chiu*, the court's instruction was error. We agree.

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 167.) For example, an error may be held harmless "'if the jury verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict *did* find without finding this point as well.'" (*People v. Chun* (2009) 45 Cal.4th 1172, 1204.) Defendant's first degree murder conviction "must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 167.) Here, nothing in the record permits us to conclude the jury based its first degree murder verdict on a valid aider and abettor theory. For example, nothing elsewhere in the verdict embraces a *direct* aider and abettor finding, and nothing makes it impossible to conclude the jury convicted under the natural and probable consequences doctrine.

Respondent argues that the jury's finding that defendant's attempt to murder Ferguson "was willful, deliberate, and premeditated" necessarily means the jury found defendant also willfully, deliberately and premeditatedly murdered Walker. The argument is without merit for the simple reason that the jury received the same natural and probable consequences instruction as to both the murder of Walker and the attempted murder of Ferguson, an instruction that permitted the jury to convict on the attempted murder count even absent defendant's own willfulness, deliberation and premeditation.[4]

---

[4] Although an aider and abettor may not be convicted of willful, deliberate, and premeditated (i.e., first degree) murder under a natural and probable consequences

The appropriate remedy is to reverse the first degree murder conviction and to "allow[] the People to accept a reduction of the conviction to second degree murder or to retry the greater offense. . . . If the People choose to retry the case, they may seek a first degree murder conviction under a direct aiding and abetting theory." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 168.) This renders moot defendant's argument that the jury should have received an instruction on second degree murder.

## 5.     Prosecutorial Misconduct

Defendant argues the prosecutor committed prejudicial misconduct by mocking his defenses of duress and necessity and by misrepresenting the law on them. He complains the prosecutor derided the defenses as "laughable," "a joke," and "garbage,"[5] and told the jury the defense of duress applies only when a gun has been put to one's head, and necessity applies only where a husband or wife must break the law to save the life of a spouse.

Respondent preliminarily argues defendant forfeited his misconduct claim by failing to object to the prosecutor's comments or seek a jury admonishment. Generally, a defendant may not complain on appeal of prosecutorial misconduct absent a timely objection at trial and a request that the jury be admonished to disregard the impropriety, unless an objection or request for admonition would have been futile or the harm could not have been cured. (*People v. McDermott* (2002) 28 Cal.4th 946, 1001.) On this record, nothing suggests either that a proper objection would have been overruled or an immediate jury admonition ineffective. Defendant was required to assert a timely and specific objection, and his failure to do so forfeits his claim of prosecutorial misconduct on appeal. (*People v. Turner* (2004) 34 Cal.4th 406, 421.) However, defendant also

---

theory, he or she may be convicted under that doctrine for "an *attempt* to commit a murder that is willful, deliberate, and premeditated." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 162, italics added.)

[5] We do not condone the use of the word "garbage." Although it is not prejudicial in this situation, it could be in other circumstances. Best practice would be not to use this term during argument.

15

argues his attorney's failure to object to the prosecutor's misconduct constituted ineffective assistance. An ineffective assistance claim may be raised for the first time on appeal. (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.)

Defendant's arguments fail on the merits.

A prosecutor's misconduct violates due process if it infects a trial with unfairness. (*People v. Harrison* (2005) 35 Cal.4th 208, 242.) Less egregious conduct may nonetheless constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to attempt to persuade the court or jury. (*Ibid*.) If a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, we consider how the statement would, or could, have been understood by a reasonable juror in the context of the entire argument and determine whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) A prosecutor may fairly comment on and argue any reasonable inferences from the evidence. (*People v. Samayoa* (1997) 15 Cal.4th 795, 837.) But a prosecutor may not suggest the existence of facts outside of the record by arguing matters not in evidence (*People v. Benson* (1990) 52 Cal.3d 754, 794-795); mischaracterize the evidence (*People v. Hill* (1998) 17 Cal.4th 800, 823); or appeal to the jury's sympathy, passion, or prejudice (*People v. Fields* (1983) 35 Cal.3d 329, 362). Although a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." (*Berger v. United States* (1935) 295 U.S. 78, 88.)

Here, the prosecutor told the jury defendant's defenses were "laughable," "a joke," and "garbage." We do not perceive these words to be outside the permissible scope of comment and argument or to have infected the trial with unfairness. "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness"' [citation], and he may 'use appropriate epithets warranted by the evidence.'" (*People v. Fosselman*, *supra*, 33 Cal.3d at p. 580.)

The prosecutor's specific comments about the defenses were not inaccurate. As to duress, the prosecutor told the jury, "'Duress' talks about duress being, like, you have to do this, someone has a gun to your head. They put a gun to your head, and they say, 'Do

16

this" . . . ." As to the defense of necessity, the prosecutor said, "'Necessity' means you had to do it. It was necessary. I had to kill that person. I had to do it out of necessity is when your wife, your husband is having a heart attack there in the car, and you drive them to the hospital, and you blow through every stop sign, you smash into a car, and you don't stop, which is a crime. And maybe you run over a dog on the way there."

These statements were nothing more than creative illustrations, not misstatements of law.

## 6. The Leniency Agreement

Defendant argues he is entitled to specific performance of a leniency agreement in which the prosecution promised to recommend a sentence of 15 years to life in exchange for truthful testimony against other perpetrators of the three shootings at issue here. The prosecution ultimately elected not to call defendant to testify after it found out he had perjured himself during his own trial. (Defendant had testified that he arrived at the Guerrero house on the day of the shootings to play Xbox with Danny Guerrero, and that while they were there Danny helped plan the shootings. In actuality, Danny was incarcerated at the time of the shootings.)

"'[A]n agreement to cooperate may be analyzed in terms of contract law standards.'" (*People v. C.S.A.* (2010) 181 Cal.App.4th 773, 779.) "'[A] defendant who seeks specifically to enforce a . . . cooperation agreement[] must show both that the promisor had actual authority to make the particular promise and that he (the defendant) detrimentally relied on it.' [Citations.] 'If either part of this showing fails, the promise is unenforceable.' [Citations.] [¶] There is a 'narrow' exception to this requisite showing, where failure to enforce an *unauthorized* cooperation agreement would render the prosecution 'fundamentally unfair.' [Citations.] [¶] To invoke this exception, a defendant must show not only detrimental reliance on the unauthorized promise, but reliance of constitutional consequence implicating due process—for example, where the defendant gives up his right to counsel or right to not incriminate himself on the basis of a promise to dismiss if he cooperates." (*Id.* at p. 779.) For example, the exception does not apply where the defendant was not induced to incriminate himself, furnish

information against himself, or plead guilty.  (*United States v. Williams* (9th Cir. Cal. 1986) 780 F.2d 802, 803.)

As defendant makes no attempt to explain how he relied on the leniency agreement to his detriment, and nothing in the record supports the conclusion that he did so rely, his argument is rejected.

### DISPOSITION

Defendant's conviction of first degree murder is reversed unless the People accept a reduction of the conviction to second degree murder.  If, after the filing of the remittitur in the trial court, the People do not bring defendant to retrial solely on the premeditation and deliberation element within the time set forth in section 1382, subdivision (a)(2) — 60 days unless waived by the defendant — the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of second degree murder and shall resentence defendant accordingly.[6]  In all other respects the judgment is affirmed.

NOT TO BE PUBLISHED.

CHANEY, Acting P. J.

We concur:

JOHNSON, J.

MOOR, J.[*]

---

[6] Respondent observes the abstract of judgment is incorrect in two other respects. The trial court will have an opportunity to correct any errors when it prepares a new abstract.

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18